We'll turn to North American Soccer League versus United Soccer Federation. Good morning. Good morning, Your Honors. Jeffrey Kessler on behalf of the appellant to North American Soccer League. Your Honors, my client, the North American Soccer League, as the district court found below, has its very existence threatened at the moment. So the issue on this appeal involves the most extreme form of irreparable harm that could be imagined for a corporate entity, its very existence, whether it will continue. We submit that if the court takes the uncontested, unchallenged findings of fact below and applies them to the correct antitrust standards, that we have satisfied any preliminary injunction standard, whether it is the heightened standard or it's the flexible sliding scale standard, although we do believe the sliding scale standard should apply. There were three at least fundamental legal errors that the court made below on the antitrust. The first one was concerted action. And the concerted action requirement simply requires two separate economic entities entering into an agreement. It's a contract combination of conspiracy. The court below conflated the concerted action requirement with the unreasonable strain of trade requirement. So I don't believe that there's any way here what we have below. Roberts. What are the separate economic entities? The separate economic entities here are Major League Soccer, the United Soccer League, the North American Soccer League, all of whom are horizontal competitors, all of whom had to agree. The ones that are acting in concerted action are the MSL and the United Soccer Federation. Is that the argument? That's part of the argument, Your Honor. So like in the associated press case in the Supreme Court, what you have is everyone has to agree to be bound by the standards. So my client has to agree. MLS has to agree. USSL has to agree. We are all bound. Imagine, Your Honor, if the standards said you all have to charge the same prices for your tickets. We would all have to agree to do that. Instead, it says you must have a minimum number of teams, you must play in certain time zones, you have other requirements. But the question of agreement, that there is multiple entities agreeing, I think, is squarely. Sotomayor, maybe you should move to the purported restraint of trade. What was anti-competitive about the standards? Your Honor, so we have to go to the findings of fact. Very unique here. We have a finding of monopoly power in a relevant market of soccer leagues only, in which the court found anti-competitive effect based on the barriers to entry it created for competition. That's not my argument, Your Honor. Those are the findings of the court below. We were failed to have made a clear showing on the anti-competitive effects and the monopoly power, which really makes this different from all the standard-setting cases cited by the USSL. We're already past the anti-competitive effect hurdle. So what then must they do? They must then show pro-competitive justifications under the rule of reason. It's their burden, because it shifts once we — once the court found, as it did, that we demonstrated this anti-competitive effect. And on that, the legal problem number two is the justifications the court recognized are ones that the Supreme Court has said are not pro-competitive, which — What's wrong with having a requirement that — or imposing a requirement that you can't have a league with, you know, five teams? Your Honor, because they are competing leagues, we let each league decide for itself. And then if consumers don't like a team with five teams, they won't go see a league with five teams. We don't create an artificial barrier, particularly, Your Honor, here, where again on the — So you're saying the requirement of 12 teams is an artificial barrier? Absolutely, Your Honor. And how do I know that? Until 2008, the requirement was eight teams. The year before — Is it not unreasonable to change the requirements as the league grows and becomes more successful? Soccer's been doing better the last couple of years. Your Honor, what it's not reasonable to do is to set requirements in order to, as the court found, an unchallenged finding, to create barriers to entry to competition which consumers are not deciding. Plus, and this is very important, Your Honor, we have here, like in the Allied Tube case, not an impartial process because the court found below, not my argument, that there was a conflict of interest created in favor of Major League Soccer to protect it because, as Major League Soccer's commissioner recently said, hundreds of millions of dollars have flowed from a Soccer United marketing agreement. When the NASL applied for, I guess, the 18 — 2018, it only had seven teams committed? It had eight teams, Your Honor. It was rejected, if you look at it, because it did not have more than eight. They have, in court, said, well, they're suspicious as to whether or not the eighth team would have been there, but that was — When you look at the history, going back to 2011, it seems that every year except one, there were waivers. In other words, it seems that the USFF was being fairly lenient with the NASL over the years and trying to give it a chance, and it was not succeeding. The other team got up to over 30 teams. I guess the USL got up to over 30 teams. And they were at a — in Division III just a couple of years ago. Actually, Your Honor, they've given far more waivers, the record shows, to both Major League Soccer and the USL than they've ever given to the NASL. So, for example — What are the barriers to competition if they're granting these waivers left and right to try to help the leagues? I don't think this is to help the league. Again, I'm going on the fact findings below unchallenged. The fact findings say that from the beginning, these standards were done to entrench the monopoly of MLS. That's what it says in the very beginning, and that the conflict of interest because of the hundreds of millions of dollars, it's not an impartial process. And this is very important, Your Honor. The court rejected a broader market involving football and basketball. That's very significant, because the pro-competitive purpose can't be to shield MLS with a monopoly within this limited relevant market and create a barrier to entry. They can't say this is necessary to help soccer to compete against football. The court rejected that market, and they don't challenge that here. And finally, on the less restrictive alternatives point, it says we know prior to 2008, eight teams were enough. Two time zones were enough. Last year, they let us play that way. All we're asking, Your Honor, is — and again, we believe it should be under the lesser standard because of the extreme harm, even if it's a mandatory injunction. I am not, Your Honor. I'm asking simply to do the following. Maintain what they did last year. If they did the same waivers last year as they did this year, under the — allow us with at least eight teams and two time zones, not three time zones, we continue, we get to survive, to test these claims in the full antitrust trial, otherwise we are driven out of existence on a record where the court found below — and again, please look at those findings of fact — that it's a monopoly, that it's anti-competitive, that it has entrenched barriers to entry, and that, in fact, it's based on a conflict of interest which the court found may compel them to do this. And the court even said we may ultimately win. But the reason we didn't get the injunction is because of the heightened standard that was applied, which even if it was a mandatory injunction, Your Honor, we believe — we qualify if the extreme harm exception to mandatory injunction means anything, it has to be when you go out of existence. The best case in this Court that's endorsed that there's two different standards on a mandate, you can satisfy one against the other sliding standard? Well, it's every case since Citigroup Global Markets. Citigroup Global Markets was a very thoughtful decision by this Court deciding whether or not to maintain the sliding scale, and the Court went through and decided that. That announced, based on the Dougherty case, announced that you either can satisfy it by a clear showing or extreme harm. Every case since then in the Second Circuit has applied that standard. Thank you. Thank you so much. Thank you. Thank you, Judge Chin. And may it please the Court, Gregory Garre on behalf of the U.S. Soccer Federation. Your Honors, there are four fatal flaws with NASL's antitrust claim here that dooms it under any standard of review. The first is that, as a practical matter, it makes no sense. Their theory is that U.S. soccer is seeking to drive NASL out of business. But the fact is that the record shows that U.S. soccer has gone out of its way over the years to help NASL take root and grow as a league, granting it waivers in seven out of the last eight seasons. And therefore, it makes no sense to say that U.S. soccer is trying to drive NASL out of business. The second problem with their theory is that the theory, as it was expressed this morning, is that U.S. soccer has conspired with horizontal competitors of NASL, like MLS or USL, to drive NASL out of business. But the decision at issue at this case to apply the standards as they are written to NASL for its 2018 application, in that case, was made by disinterested independent directors. People like Lisa Carno, who is a trustee at Columbia University, former Secretary of Health and Human Services Donna Shalala, Val Ackerman, Commissioner of the Big East. These are people who serve in essentially a pro bono capacity for U.S. soccer to help that entity achieve its mission of driving NASL out of business. The third fatal problem with their theory is it lacks the central prerequisite, the central factual prerequisite, of a theory of concerted action in the context of a standard-setting organization. This Court has made clear, for example, in the A.D. S.A.T. case, that just having a trade association or standard-setting organization itself isn't enough to establish concerted action. Instead, what the case has looked at and required the plaintiffs to show — Roberts. The argument isn't that it's just within the association. It's with MLS and USL. Garrett. Right. And — Roberts. Related entities, arguably, but other entities. Garrett. That's right, Your Honor. I mean, I think their position, you'll see that it's evolved over time, from one in the complaint to horizontal competitors to one focusing on U.S. soccer itself. The problem with the horizontal competitor theory is there's absolutely no evidence that these entities came together with a conscious agreement to drive NASL out of business. And so that's why they quickly shift, in their briefs to this Court, to the process by which U.S. soccer applied — Roberts. Joint marketing efforts? Garrett. Right. Roberts. Is that evidence of — Garrett. So this is the sum agreement. And, you know, this may be the sum of their claim at this point. They've made the really sort of outlandish assertion in their briefs that this agreement amounts to a bribe. So let me talk about the agreement. This is an agreement, an arm's-length agreement, by which U.S. soccer contracted with some, Soccer United Marketing, so that some could market U.S. soccer's rights. Now, there's several things to understand about this agreement. The first is, is that this agreement was entered into years before NASL even existed. So it's inconceivable that this agreement could have operated as a bribe to drive NASL out of business when NASL didn't exist when the agreement was entered into. The second thing to know about it is that it's absolutely clear — and Professor Peterson discusses this in his reply declaration in particular — that no revenues from MLS flow to U.S. soccer under this agreement. I would point you to page A902 of the joint appendix, as well as Mr. Gulati discusses this agreement at A265 and 267. So there's absolutely no basis for this claim that MLS is somehow funneling money to U.S. soccer through this agreement. In fact, the plaintiff's own expert, Mr. Simansky, argued — and you can see this at A903 of the appendix — that what was happening under this agreement is that money was being funneled in the opposite way. So this agreement in no way establishes concerted action. It in no way supports the theory that U.S. soccer somehow conspired with anyone to drive NASL out of business. And yet that's all they're left with at this point of the case, Your Honor. The other thing I would say about this is there's absolutely no evidence that any of the individual directors at U.S. soccer who voted on the decision of whether to apply the standards for the 2018 application had any interest or involvement with the sum agreement. And that's why the district court found, and this is at page 47 of her opinion, that there was no evidence that they had failed to show that there was any unique or extreme pressure applied to the decision-making process of this entity. And that's really — that's really the end of the case under — under the — the antitrust cases dealing with standard-setting organizations. The argument that they are on the verge of shutting down and an injunction gives them at least a fighting chance. So a couple things on that. First, even if they could show irreparable harm, they've got to show a likelihood of success or a claim on the merits to obtain an injunction. I mean, the Supreme Court was very clear in the Winner case and other cases like the extreme remedy, and it wouldn't be enough just to show harm. They've got to show a likelihood of success on the merits. The second thing I would say is look at the irreparable harm determination. Now, we think as a matter of law the district court actually applied the wrong standard. She looked to whether there was a possibility that they could go out of business. I mean, if you look at her decision on pages 18, 19, and And a potential loss is not a likely loss. And for that reason, it can't satisfy the standard under Winter. But then look at the evidence that they've come forward. The only evidence in the record on irreparable harm is the evidence that we put in that shows that the United States Soccer League was — was changed from a Division II to Division III league, just like NASL now faces, in 2011. And what happened to that league? It not only survived, it thrived. That evidence is in the record. I would also point, Your Honors, to the evidence that we've put into the record showing that Division III teams not only can meet but at times exceed the financial revenues and ticket — ticket numbers of Division II teams. So actually, if you look at the only evidence in the record on irreparable harm, it would show that the notion that NASL is going to go out of business if it is changed from a Division II to Division III is refuted by the evidence. Now, what they have in response is a classic example of an attempt to show irreparable harm through self-inflicted harm. They've come forward with declarations that make vague assertions like, well, we'll be in jeopardy, or we won't meet our goals. That can't establish irreparable harm. If it did, then any lawyer could drum up irreparable harm. They've come up with these purported letters of commitments by owners of amateur teams saying, well, we would apply if they were a Division II team. But again, these — these letters, which are almost identically written and therefore almost certainly were written with the benefit of counsel, can't be enough to create or establish a likelihood of irreparable harm, or any lawyer with assault could generate a finding of irreparable harm. So we don't think that the record supports that, Your Honor. The only evidence in the record is of an example like this, is the USL example, where USL was changed to Division III and it survived and thrived. Now, with respect to the pro-competitive justifications, Your Honor, the district court found that there were pro-competitive justifications for these standards, and really the court need no look for — need look no further than the statement of NASL's own CEO when he explained that the reason why we have these standards is that fans lose interest in a team who's in a league with rampant failures, team failures and league failures. And what we have, if you take a step back and look at the broad picture here, you have a situation in which these standards were adopted before NASL existed and before even MLS existed, as an effort by US Soccer in its best determination to halt the rampant league and team failures that had plagued US Soccer, professional soccer in this country for decades. And since then, what we have, as the district court recognized, is an unprecedented growth and success of professional soccer in the United States, underscoring the pro-competitive purpose and effect of these standards. The only way to rule for NASL in this case would be to engage in their radical reconception of the antitrust laws, and it would effectively put the courts into the position of governing professional soccer in this case. There's no reason for this court to go down this road. The district court carefully considered their arguments. It properly rejected them. There's no basis for this court to find that it abused her discretion in denying the preliminary injunction at issue. Unless the Court has any further questions, we'd ask the Court to affirm. Thank you, Your Honors. Roberts. We'll hear the rebuttal. Thank you. First of all, whether or not the directors were disinterested who voted is irrelevant, because we've already been found to meet the anticompetitive effect hurdle. The Court said anticompetitive effect entrenched the monopoly, so we're up to the pro-competitive justification. It just doesn't matter. On pro-competitive justification, the one just articulated by counsel, that it will be unstable for teams to go and leave, does not carry the day when your relevant market is limited to professional soccer leagues. So the only league they're protecting is MLS. They can't argue we need this to have a pro-competitive effect to make soccer more popular against football. That market was rejected, and they don't challenge it. So looking in this market, what the evidence shows, and I heard counsel say there was no benefit. Their commissioner, Mr. Garber, two days ago said hundreds of millions was given by some MLS to USSF. That's a direct quote from him. Our expert explained, it is not your honor, but to hear counsel say one thing and his client say another thing publicly two days ago, when our expert explained on the agreement how those hundreds of millions of dollars flow, I think is misleading to the Court. But finally, your honor, says ally tube adopted in this court with favor in the Jaboin case, it's mentioning it, it's quoting it. When you're dealing with these standard settings, and the process is not impartial because of the district court's finding of this financial interest and conflict of interest, because of that, you have gotten past, with the anti-competitive effect, the absence of pro-competitive justification, which is their burden, and the clear fact that there are less restrictive alternatives because just last year we played without this and soccer was doing well, as your honor said, even when they allowed us to play with eight teams and in two time zones. So it comes down to will this drive us out of business? Your honor, look at the record. Four owners have explained we will be driven out of business. Six others have signed letters of intent saying they only can play if it's Division 2. And the U.S.S.F. conceded, because of FIFA, because of the importance of this designation, they decide who can play and who can't. It's different from a normal trade association that certifies a product. Here, without this designation, you just can't play. And the record below shows the massive losses we've been incurring even on Division 2. So, your honor, again, the fate of our clients in your hands. I hope you will consider this and also consider that given this, on the Second Circuit precedent, it should be the lesser standard. And if we just show serious questions, and these are far more than serious questions, we should live to get another day in court. Thank you, your honor. Thank you for the extra time. I appreciate that. Roberts. Thank you. We'll reserve decision.